# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CARLOS RUIZ,

      Plaintiff

v.

NEVADA DEPARTMENT OF
CORRECTIONS, et al.,

      Defendants

Case No.: 3:18-cv-00206-RCJ-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 69, 72

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's motion for summary judgment. (ECF No. 69.) Defendants filed a response (ECF No. 74), and Plaintiff filed a reply (ECF No. 75). Also before the court is Defendants' motion for summary judgment. (ECF Nos. 72, 72-1 to 72-16.) Plaintiff filed a response (ECF No. 77), and Defendants filed a reply (ECF Nos. 81, 81-1).

After a thorough review, it is recommended that Plaintiff's and Defendants' motions be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (First Amended Complaint (FAC), ECF No. 6.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC). (*Id.*)

The court screened Plaintiff's FAC, and determined Plaintiff could proceed with claims under the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). (ECF No. 9.)

In Count I, Plaintiff was allowed to proceed with Free Exercise Clause and RLUIPA claims based on allegations that Plaintiff observes Messianic Judaism, which requires holy days to be observed on the actual date the holy days occur, and to use matzah bread and grape juice on certain holy days. Plaintiff claims that Administrative Regulation (AR) 810 restricts his ability to observe the Messianic holy days on their actual dates, and does not provide matzah or grape juice to indigent Messianic inmates for certain holy days. For the Free Exercise Clause claim, Plaintiff was allowed to proceed against Baker, Carpenter, Dzurenda, Sisolak, Ford and Cegavske. The latter four defendants were only allowed to be sued for injunctive relief. For the RLUIPA claim, Plaintiff was allowed to proceed against Baker, Carpenter, Dzurenda, Ford and Cegavske for injunctive relief only. [1]

In Count II, Plaintiff was allowed to proceed with Free Exercise Clause and RLUIPA claims based on allegations that his faith requires him to eat kosher meals, but the common fare food is not kosher, and AR 814 does not correctly set forth kosher guidelines. The Free Exercise Clause claim was allowed to proceed against Henry, Rosskamm, Stammerjohn, Baker, Wickham and Carpenter. The RLUIPA claim was allowed to proceed against Dzurenda, Sisolak, Ford, Cegavske, Rosskamm, Henry, Stammerjohn, Baker, Carpenter, and the Doe Chief Medical Officer (when Plaintiff learned of his or her identity), for injunctive relief only.

---

[1] A prisoner may not state a claim under RLUIPA for damages, but instead may seek prospective injunctive relief against defendants in their official capacities. *Jones v. Slade*, 23 F.4th 1124, n. 4 (9th Cir. 2022) (citing *Sossamon v. Texas*, 563 U.S. 277, 285 (2011); *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014)).

Defendant Rosskamm has been dismissed for failure to timely serve him under Federal Rule of Civil Procedure 4(m). (ECF No. 46.)

Plaintiff moves for summary judgment, arguing Defendants have substantially burdened his religious exercise under the Free Exercise Clause and RLUIPA. Defendants oppose Plaintiff's motion, and have filed a cross-motion for summary judgment. Defendants question the sincerity of Plaintiff's religious belief and argue they did not substantially burden Plaintiff's religious exercise. Alternatively, they contend they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex*, 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson*, 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Free Exercise Clause & RLUIPA Standards**

**1. Free Exercise Clause**

Plaintiff argues that strict scrutiny applies to his First Amendment free exercise claim. Plaintiff is mistaken.

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment...prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citations and quotation marks omitted, alteration original). "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Hartmann*, 707 F.3d at 1122; *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

To implicate the free exercise clause, a prisoner must establish his belief is both sincerely held and rooted in religious belief. *See Shakur*, 514 F.3d at 884-85. "The Free Exercise Clause does not require plaintiffs to prove the centrality or consistency of their religious practice: 'It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith.'" *Jones v. Slade,* 23 F.4th 1124, 1145 (9th Cir. 2022) (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 689 (1989)). The test is whether the plaintiff sincerely believes the conduct at issue is consistent with his faith. *Id.* (citation omitted).

"A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion." *Jones v. Williams,* 791 F.3d 1023, 1032 (9th Cir. 2015) (citing *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987), *aff'd sub nom. Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)).

"Once a claimant demonstrates that the challenged regulation impinges on his sincerely held religious exercise, the burden shifts to the government to show that the regulation is 'reasonably related to legitimate penological interests.'" *Jones,* 23 F.4th at 1144 (quoting *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015)).

In analyzing the legitimacy of regulation of a prisoner's religious expression, the court is instructed to utilize the "reasonableness" factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987). *See O'Lone*, 482 U.S. at 349; *Jones*, 791 F.3d at 1032; *Shakur*, 514 F.3d at 884. "To ensure that courts afford the appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349 (citation omitted).

1    The *Turner* factors are: (1) "there must be a 'valid, rational connection' between the

2  prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether

3  there are alternative means of exercising the right that remain open to prison inmates: (3) "the

4  impact accommodation of the asserted constitutional right will have on guards and other inmates,

5  and on the allocation of prison resources generally"; (4) the "absence of ready alternatives" and

6  "the existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91; *see also O'Lone*, 482

7  U.S. at 349.

8      **2. RLUIPA**

9          No government shall impose a substantial burden on the religious
           exercise of a person residing in or confined to an institution...even
10         if the burden results from a rule of general applicability, unless the
           government demonstrates that imposition of the burden on that
11         person--(1) is in furtherance of a compelling governmental interest;
           and (2) is the least restrictive means of furthering that compelling
12         governmental interest.

13  42 U.S.C. § 2000cc-1(a). RLUIPA is "more generous to the religiously observant than the Free

14  Exercise Clause." *Jones,* 23 F.4th at 1139 (citations omitted).

15      "The Supreme Court has recognized RLUIPA as...[a] 'congressional effort[] to accord

16  religious exercise heightened protection from government-imposed burdens[.]'" *Greene* v.

17  *Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709,

18  714 (2005)). "As such, RLUIPA is to be 'construed broadly in favor of protecting an inmate's

19  right to exercise his religious  beliefs.'" *Jones,* 23 F.4th at 1140 (quoting *Warsoldier v.*

20  *Woodford,* 418 F.3d 989, 995 (9th Cir. 2005)); *see also Johnson v. Baker,* 23 F.4th 1209, 1214

21  (9th Cir. 2022) (citation omitted). However, "[c]ourts are expected to apply RLUIPA's standard

22  with due deference to the experience and expertise of prison and jail administrators in

23  establishing necessary regulations and procedures to maintain good order, security and

7

discipline, consistent with consideration of costs and limited resources." *Hartmann v. Cal. Dep't. of Corr.*, 707 F.3d 1114, 1124 (9th Cir. 2013) (internal quotation marks and citation omitted).

"Under RLUIPA, the challenging party bears the initial burden of proving that his religious exercise is grounded in a sincerely held religious belief ..., and that the government's action substantially burdens his religious exercise." *Holt v. Hobbs*, 135 S.Ct. 853, 857 (2015) (citations omitted); *see also Jones,* 23 F.4th at 1140; *Johnson,* 23 F.4th at 1214

Thus, the court must begin by "identifying the 'religious exercise' allegedly impinged upon.'" *Greene*, 513 F.3d at 987. "Religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "That means that RLUIPA protects not only practices deemed orthodox by some recognized religious organization, but also idiosyncratic practices—practices 'not compelled by, or central, to a [given] system of religious belief.'" *Jones,* 23 F.4th at 1141 (citation omitted).

Courts "have read RLUIPA's reference to 'any exercise of religion' literally (and thus broadly in favor of inmates) to include not only 'the belief and profession' of faith, but also individual 'physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine.'" *Id*. (quoting *Greene*, 513 F.3d at 987, alteration original, other citations omitted). RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Greene*, 513 F.3d at 987 (quoting *Cutter*, 544 U.S. at 725 n. 13; 42 U.S.C. § 2000cc-5(7)(A)). The "initial RLUIPA step requires a narrow inquiry focused on (1) the specific religious practice at issue and (2) the specific practitioner." *Johnson,* 23 F.4th 1209, 2022 WL 224030, at *4 (9th Cir. 2022).

"In the context of a prisoner's constitutional challenge to institutional policies, [the Ninth Circuit] has held that a substantial burden occurs 'where the state...denies [an important benefit]

because of conduct mandated by religious belief, thereby putting substantial pressure on the adherent to modify his behavior and to violate his beliefs." *Hartmann*, 707 F.3d at 1125 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005)) (internal quotation marks omitted); *see also Jones*, 23 F.4th at 1142. A "substantial burden" on "religious exercise" "must impose a significantly great restriction or onus upon such exercise." *Greene*, 513 F.3d at 987 (quoting *San Jose Christian Coll. V. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)); *Jones*, 23 F.4th at 1142 (citation omitted).

"A policy may impose a substantial burden on religious exercise in a number of ways." *Jones,* 23 F.4th at 1140. "A regulation may impact religious exercise directly, by forbidding conduct that an inmate believes he is religiously compelled to do, *see O'Lone v. Est. of Shabazz,* 482 U.S. 342, 344-45 … (1987) (assigning Muslim prisoners to work schedule that prevented them from attending Friday prayer services commanded by Qur'an), or by compelling an inmate to do that which he believes he is religiously forbidden from doing, *see Holt,* 574 U.S. at 355, 359 … (requiring Muslim prisoner to violate religious beliefs that forbade trimming his beard); *Warsoldier,* 418 F.3d at 992, 995-96 (requiring Native American prisoner to violate religious beliefs that forbade cutting his hair)." *Id.* "More subtly, a regulation may impact religious exercise indirectly, by encouraging an inmate to do that which he is religiously prohibited or discouraged from doing, *see Greenhill v. Clarke*, 944 F.3d 243, 259-51 (4th Cir. 2019) (withholding participation in religious services 'as an incentive to improve inmate conduct'), or by discouraging an inmate from doing that which he is religiously compelled or encouraged to do, *see Jones v. Carter,* 915 F.3d 1147, 1150-51 (7th Cir. 2019) (discouraging inmates from choosing halal meals by charging for halal meat); *Shilling v. Crawford,* 536 F.Supp.2d 1227, 1233 (D. Nev. 2008) (offering Jewish prisoner choice between staying at a medium security facility

without kosher meals or transferring to a maximum security facility with kosher meals), *aff'd*

377 F.Appx. 702 (9th Cir. 2010)." *Id.*

If the plaintiff makes a showing of a substantial burden on the exercise of his religion, the court's analysis then turns to whether the defendant has established that the burden furthers "a compelling governmental interest," and does so "by the least restrictive means." 42 U.S.C. § 2000cc-1(a), (b); *Holt,* 135 S.Ct. at 857 (citation omitted); *Jones,* 23 F.4th at 1141 (citations omitted); *Greene*, 513 F.3d at 988.

This is an "exceptionally demanding" standard, which requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Holt*, 135 S.Ct. At 858 (internal citation and quotation marks omitted).

"Although RLUIPA adopts a compelling interest standard, context matters in the application of the standard, and courts should act with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Jones,* 23 F.4th at 1141 (quoting *Cutter,* 544 U.S. at 723).

While prison administrators are "accorded deference with regard to prison security," they must establish that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Greene*, 513 F.3d at 989 (quoting *Warsoldier*, 418 F.3d at 999) (internal quotation marks omitted). "[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing the need to maintain order and security in a prison. RLUIPA requires more." *Id*. at 989-90. Moreover, "RLUIPA does not permit ... unquestioning deference." *Holt,* 574 U.S. at 364; *see also Johnson,* 23 F.4th at 1217 ("we don't

grant 'unquestioning deference' to the government's claim of a general security interest").

"Instead, 'prison officials *must* set forth detailed evidence, tailored to the situation before the

court, that identifies the failings in the alternatives advanced by the prisoner.'" *Johnson*, 23 F.4th

at 1217 (emphasis original, quoting *Warsoldier*, 418 F.3d at 1000). "To this end, RLUIPA

requires a 'more focused' inquiry that looks at the challenged regulation's application to 'the

particular claimant whose sincere exercise of religion is being substantially burdened.'" *Id*.

(quoting *Holt*, 574 U.S. at 363). "[T]he government may not satisfy the compelling interest test

by pointing to a general interest—it must show the 'marginal interest in enforcing' the [policy at

issue against the particular inmate]." *Id*. (citation omitted).

**B. Count I**

   **1. Holy Days**

  Plaintiff alleges that he was precluded from observing the Messianic holy days on their

actual dates.

  Plaintiff states in his affidavit that he is a sincere Messianic believer, and that Messianic

adherents are commanded to keep the following holy days: Sabbath (weekly); Passover (8 days);

Shavout (1 day); Yom Teruah (1 day); Yom Kippur (1 day); Sukkot (8 days); and Rosh Codesh

(new moons, 1 day each month). (Pl. Aff, ECF No. 69 at 33 ¶ 2.) Failing to keep the holy day

observances causes a Messianic to sin, which leads to death. (*Id*. at 35 ¶ 9.) Defendants do not

appear to dispute that Plaintiff has a sincerely held belief that he must observe the Messianic

holy days on the days they actually occur.

  According to Plaintiff, between 2014 and February 2018, Messianics were allowed to

celebrate their holy days on the dates they occurred. (Pl. Aff, ECF No. 69 at 33 ¶ 5.)

On January 18, 2018, Carpenter issued a memo stating that effective February 1, 2018, LCC would be implementing a new chapel schedule to conform with AR 810/the Religious Practice Manual to ensure there was adequate staff oversight of chapel services after "out count" services were eliminated due to staffing issues. The memo stated that *all special holy days would be scheduled in conjunction with the regularly scheduled religious time slots*. The memo went on to state that if there was a need for special consideration, institutional staff would be made aware. (ECF No. 72-8 at 2; Carpenter Decl., ECF No. 72-12; Baker Decl., ECF No. 72-11.)

Following Carpenter's memo, Plaintiff maintains Messianics have not been allowed to keep their holy day observances on the dates they occur. (Pl. Aff., ECF No. 77 at 35 ¶ 15.)

Plaintiff filed an informal level grievance on March 7, 2019, asserting that he and all Messianic believers were not allowed to assemble together on their holy days on the dates that they occur. (ECF No. 69 at 55-60.)

J. Ferro (not a defendant) responded to the informal level grievance:

> … The religious needs of inmates will be met, taking into consideration safety, security, available resources and need. However, resources and facilities for worship are extremely limited; all groups are expected to make sacrifices so that all religious worshipers will have some access to facilities for religious activities. With that being said no institution/facility is mandated to allow the celebration on the actual date, and  may allow the holy day to be celebrated on an alternate date including the Faith Group's normally scheduled weekly worship time. Grievance denied.

> (ECF No. 69 at 61.)

On April 1, 2019, Plaintiff filed a first level grievance. (ECF No. 69 at 63.) Baker responded to the first level grievance:

> …Each institution/facility may attempt to accommodate all recognized Faith Groups in celebrating their AR 810 recognized holy days (as set forth in the Faith Group Overview) on the actual

day on which they occur. This option is considered in light of the
Institution/facility's staffing, yard movement, impact on other
programs, cost, resources, and safety and security issues. No
institution/facility is mandated to allow the celebration on the
actual date, and may allow the holy day to be celebrated on an
alternate date including during the Faith Group's normally
scheduled weekly worship day. Grievance denied.

(ECF No. 69 at 64.)

Plaintiff filed a second level grievance, stating that LCC let inmates observe their holy

days on their actual dates until Chaplain Scott Davis decided to change this. (ECF No. 69 at 66.)

Wickham responded to the second level grievance, repeating Baker's response to the first

level grievance. (ECF No. 69 at 67.)

Baker acknowledges that some Messianic services were previously allowed on days other

than the days they were scheduled for regular worship. (Baker Decl., ECF No. 72-11 ¶ 9.)

The NDOC Religious Practice Manual, effective September 5, 2017, provides that "[i]n

scheduling religious activities, the Chaplain will seek to accommodate Faith Groups, including

those that call for particular times, and calendar or lunar dates for specific services or

ceremonies. Safety and Security is a priority in scheduling religious activities." (ECF No. 72-2 at

9.) It goes on to state:

Each institution/facility may attempt to accommodate all
recognized Faith Groups in celebrating their AR 810 recognized
holy days (as set forth in the faith Group Overview) on the actual
day on which they occur. This option is considered in light of the
institution/facility's staffing, yard movement, impact on other
programs, cost, resources, and safety and security issues. No
institution/facility is mandated to allow the celebration on the
actual date, and may allow the holy day to be celebrated on an
alternate date including during the Faith Group's normally
scheduled weekly wordship day.

(ECF No. 72-2 at 13.)

13

1      If an inmate wishes to schedule a special religious holy day service/meeting, they must

2 submit a fully completed request for recognized holy day service to the chaplain at least 30 days,

3 but no more than 45 days, in advance of the holy day. The chaplain will recommend whether to

4 grant or deny the request to the warden. (ECF No. 77-2 at 18.)

5      Plaintiff presents evidence that up until the time Carpenter sent out her memo, Messianics

6 had been allowed to celebrate their holy days on their actual dates. After Carpenter sent out her

7 memo, Plaintiff filed a grievance stating that Messianics were not being permitted to celebrate

8 their holy days on the dates they occur. Plaintiff does not address whether he sent a request to

9 observe a holy day on its actual date pursuant to the Religious Practice Manual.

10      Defendants argue there was no substantial burden because holy days may be observed on

11 the actual days if inmates properly request the date and if the prison can accommodate the

12 request under AR 810/the Religious Practice Manual. The Religious Practice Manual does have a

13 provision for an inmate to request to schedule a special holy day.  However, Carpenter's memo,

14 which post-dates the effective date of the Religious Practice Manual, could be interpreted as

15 disallowing such requests for an accommodation regarding the dates. If the memo just carried on

16 the status quo—allowing inmates to request to observe their holy days on their actual dates—

17 then there was no obvious purpose Carpenter's memo. While the memo said that if there was a

18 need for special consideration, institutional staff would be made aware, it did not specify what

19 qualified as a "special consideration" or how staff would be made aware. Defendants do not

20 address the interplay between the Religious Practice Manual and Carpenter's memo.

21      Moreover, when Plaintiff raised the issue in his grievance, he was told by Baker and

22 Wickham that that prison *may* accommodate such requests, but is *not* required to do so. The

23

grievance responses did not direct Plaintiff to submit a request for an accommodation under the

Religious Practice Manual.

Even assuming Plaintiff's religious exercise was substantially burdened, Defendants do

not address the *Turner* reasonableness factors under the Free Exercise Claim, or whether the

policy furthers a compelling government interest by the least restrictive means under RLUIPA.

Defendants make passing reference to "out counts," but do not make a specific connection

between elimination of "out counts" and the limitation on holy days being observed on their

actual dates.

In sum, there is a genuine dispute of material fact as to whether Plaintiff's sincerely held

religious belief was substantially burdened under the First Amendment or RLUIPA. As such,

both Plaintiff's and Defendants' motions should be denied as to the Free Exercise and RLUIPA

claims related to holy days in Count I.

**2. Matzah and Grape Juice**

Plaintiff's claim in Count II is based on allegations Defendants do not provide matzah or

grape juice to indigent Messianic inmates for certain holy days.

Plaintiff asserts that he sincerely believes that as a Messianic he must consume matzah

and grape juice during certain holy days. (Pl. Aff., ECF No. 69 at 5 ¶¶ 3-4.) Defendants do not

appear to dispute that this is his sincerely held religious belief.

Plaintiff submits a version of NDOC's Religious Practice Manual that was effective

*February 12, 2014*, which states that faith groups that require special consumables for worship

such as grape juice, bread or kosher items, are responsible for obtaining the items themselves

from the canteen, an approved vendor, or an approved religious organization. Outside

1  volunteers/sponsors may also provide consumables for special religious holidays with prior

2  approval of the warden. (ECF No. 69 at 75.)

3      Defendants submit a more recent version of the Religious Practice Manual, effective

4  *September 5, 2017,*which states that only foods purchased from canteen services or supplied by

5  the culinary are allowed in the chapel. It further states that faith groups desiring food for AR 810

6  approved religious holy day celebrations are responsible for purchasing it from canteen services.

7  (AR 72-2 at 20.)

8      Defendants provide Plaintiff's canteen purchase history which reflect that he has the

9  means to purchase items from the canteen. (ECF No. 72-4.) That is true; however, Plaintiff,

10 states that grape juice and matzah are not available to purchase from the canteen, and he is not

11 affiliated with or supported by any outside group to provide him with bread or grape juice.

12     Defendants initially argued that matzah and grape juice are available for purchase from

13 the canteen, but in their reply brief they acknowledge that grape juice cannot be purchased from

14 the canteen because it can be made into prison-made alcohol known as "pruno." (Davis Decl.,

15 ECF No. 81-1.)

16     Chaplain Davis states that his church was allowed to donate pre-packaged cups of grape

17 juice with a wafer sealed on top of the lid if the items were used in the chapel and were not

18 allowed to be taken back to an inmate's cell. According to Chaplain Davis, any chapel group that

19 wanted such elements had to kite him with the number of cups required. To Chaplain Davis'

20 knowledge, Plaintiff never requested the grape juice cups. In addition, he states that other groups

21 have used fruit punch in place of grape juice. Chaplain Davis further states that matzah bread is

22 *now* available from the canteen as a group item and has to be signed out from the operations

23 sergeant before the scheduled service. Chaplain Davis does note that he has not given out any

16

1  grape juice cups recently because the chapel has been closed due to the COVID-19 pandemic.

2  (*Id.*)

3        The court is disappointed that the information from Chaplain Davis was provided for the

4  first time in Defendants' reply brief, to which Plaintiff did not have an opportunity to respond. It

5  is inappropriate for the court to consider arguments raised for the first time in a reply brief. *See*

6  *Cedano-Viera v. Ashcroft,* 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003) (citing *Thompson v.*

7  *Commissioner,* 631 F.2d 642, 649 (9th Cir. 1980)); *Bazuye v. INS*, 79 F.3d 118, 120 (9th Cir.

8  1996) (citing *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)).

9        Moreover, Chaplain Davis does not state *when* individual grape juice cups were made

10 available to inmates. Nor does he specifically address whether and how *Plaintiff* was made aware

11 of this offering. Defendants also fail to explain why Chaplain Davis was able to offer grape juice

12 cups to inmates when the more recent version of the Religious Practice Manual requires that

13 such items be purchased from the canteen.

14       While Chaplain Davis asserts that matzah is now available as a group item, he does not

15 state *when* it became available. He also indicates that the chapel has been closed due to the

16 COVID-19 pandemic, and it is unclear whether inmates are allowed to participate in group

17 services at all (as opposed to group services in the chapel), and if not, whether they are able to

18 obtain grape juice cups or matzah for individual use.

19       Defendants cite the decision in *Bautista v. NDOC*, 3:18-cv-194-MMD-WGC in support

20 their position. Bautista also claimed that the prison should be required to supply him with matzah

21 and grape juice for the Sabbath and high holy days. In that case, the defendants argued that

22 Plaintiff could purchase those items through the canteen or obtain them from approved vendors.

23 Unlike Plaintiff here, Bautista did not present evidence that these items were unavailable for

1  purchase through the canteen. Nor was there evidence that those items were made available on a

2  donation-basis, as Chaplain Davis states here.

3       In sum, there remain disputed facts regarding whether Plaintiff's religious exercise has

4  been substantially burdened insofar as access to grape juice and matzah is concerned.[2]

5       Therefore, Plaintiff's and Defendants' motions for summary judgment should be denied

6  as to the free exercise and RLUIPA claims regarding grape juice and matzah in Count I.

7  **C. Count II**

8       Preliminarily, Defendants argue that Plaintiff is "changing the goal posts" by arguing that

9  the Common Fare diet is not organic because he was only allowed to proceed on screening with

10  his claim that the Common Fare diet is not kosher and that AR 814 does not correctly set forth

11  kosher guidelines. (*See* ECF No. 74 at 6:3-7.) Plaintiff is not "changing the goal posts" because

12  Plaintiff's FAC alleges, and the screening order mentions, Plaintiff's contention that the

13  Common Fare diet is not kosher because his beliefs require him to eat organic fruits, vegetables

14  and meat. (*See* ECF No. 6 at 22 ¶ 18, 23 ¶¶ 23, 24, 25; ECF No. 9 at 8:16-17.)

15       The screening order allowed Plaintiff to proceed with RLUIPA and Free Exercise claims

16  based on allegations that the Common Fare diet is not kosher. The allegations in Plaintiff's FAC

17  on this issue are that Common Fare fruits and vegetables and drinks do not have a kosher seal;

18  the fruits, vegetables and meat served are not organic and; AR 814 does not set forth correct

19  kosher guidelines.

20

21

---

22  [2] The current availability of matzah and grape juice may have an impact on Plaintiff's claims for prospective injunctive relief, but the court does not have sufficient evidence in the record before

23  it to make a determination on that issue. Again, Plaintiff may only pursue prospective declaratory or injunctive relief with respect to his RLUIPA claim.

1    Plaintiff was not, however, permitted to proceed with claims concerning other extraneous

2 allegations in the FAC that: NDOC's Common Fare agreement is unconstitutional; Common

3 Fare participants judged to have violated the definition of kosher are restricted from receiving

4 Common Fare meals until the grievance process is over; Common Fare forces inmates to become

5 vegetarians; Plaintiff's equal protection rights were violated because the Common Fare diet

6 contains less meat than the mainline meals[3]; the chow hall is not cleaned in between units; there

7 are no festive holy day foods for Messianic holy days; Messianics are served cold food for the

8 Sabbath and high holy days; AR 814 does not meet the Federal Bureau of Prisons standard for

9 kosher foods; NDOC targets inmates who request a religious diet by serving them with a notice

10 of charges if they eat an item off the mainline, leave food on the table or give their food away;

11 the Common Fare diet does not meet the guidelines for caloric intake of prisoners; and mainline

12 inmates get special holiday foods while Messianics do not. Therefore, the court will not address

13 Plaintiff's arguments on these issues.[4]

14    The sincere religious belief/religious exercise for purposes of Count II is keeping kosher.

15 Defendants present evidence that NDOC's Common Fare menu is certified kosher by

16 Scroll K/Vaad Hakashrus (Scroll K). (Rabbi Rosskamm Decl., ECF No. 72-10.) Rabbi

17 Rosskamm asserts that all foods purchased for the Common Fare menu, except fresh fruits and

18 vegetables, are certified by an appropriate recognized standard (kosher) symbol. (ECF No. 72-3

19 at 3.)

20 _____

21 [3] That argument that Messianic inmates' equal protection rights are violated by not serving them as much meats as mainline inmates was rejected in *Bautista v. NDOC*. (*See* 3:18-cv-00194-

22 MMD-WGC, ECF Nos. 78, 84.)

[4] If Plaintiff disagreed with the court limiting his claim in Count II to his allegations that the

23 Common Fare diet was not kosher, his remedy was to seek reconsideration of the screening order, which he did not do.

1       Plaintiff requested a kosher diet through NDOC's Common Fare menu on

2 January 31, 2012. (ECF No. 72-6.)

3       In his affidavit, Plaintiff states that Messianics require organic fruits and vegetables to

4 eat; eating and drinking unkosher foods or non-organic meats, vegetables and fruits defile a

5 Messianic; Messianic adherents cannot eat meat with antibiotics or growth hormones; and his

6 salvation is based upon him eating clean foods to cleanse his body so he can enter the new

7 Jerusalem. (ECF No. 69 at 43 ¶¶ 25, 26; ECF No. 69 at 15 ¶¶ 29, 31; ECF No. 69 at 27.)

8       Defendants, on the other hand, question the sincerity of Plaintiff's belief that he is

9 required to eat kosher meals because he has ordered items from the canteen that are not kosher

10 including summer sausage, shrimp ramen and Cheetos. (ECF No. 72-4.) In addition, in 2018, he

11 refused to sign the agreement, which resulted in his removal from Common Fare diet, which they

12 contend he would not have done if he sincerely believed he must maintain a kosher diet. (ECF

13 No. 72-5.)

14       There is a genuine dispute of material fact as to whether Plaintiff's religious belief that he

15 requires a kosher diet is sincerely held in light of his deviations from the Common Fare diet,

16 including his canteen purchases and refusal to sign the Common Fare diet agreement.

17       The parties also dispute whether the Common Fare diet Plaintiff was receiving satisfied

18 his belief that he keep a kosher diet. Defendants assert that Plaintiff received a certified kosher

19 meal through the Common Fare program. Plaintiff argues that certification from a rabbi does not

20 meet his needs for a scripturally kosher diet according to his Messianic beliefs.  Moreover, the

21 parties dispute whether the fruits and vegetables served to Plaintiff under the Common Fare diet

22 are kosher, even though they do not have a kosher symbol. Consequently, there is a dispute as to

23

whether Defendants imposed a substantial burden on his religious exercise by not providing Plaintiff with the kosher, organic diet he seeks.

Assuming Plaintiff has a sincerely held religious belief in maintaining a kosher diet, Defendants argue in their reply that the prison has a legitimate penological interest in maintaining a simple food service, citing the declaration of LCC's food services manager, Maribelle Henry. (ECF No. 81 at 3:18-19.) Henry's declaration, however, does not include a discussion concerning maintaining a simple food service. (Henry Decl., ECF No. 72-9.)

Again, Defendants do not adequately address whether the failure to provide Plaintiff with the organic, kosher diet he seeks is reasonably related to legitimate penological interests (under the Free Exercise Clause) or is the least restrictive means of furthering a compelling government interest (under RLUIPA).

In response to Plaintiff's motion for injunctive relief, Defendants generally raised cost and security as reasons for not providing Plaintiff with the scripturally kosher diet he seeks, and Magistrate Judge William G. Cobb specifically advised Defendants that broad reference to these interests without the support of specific evidence was insufficient. (*See* ECF No. 52 at 12.) Defendants did not heed the court's instruction.

There may well be both legitimate and compelling reasons for not providing Plaintiff with the diet he seeks, including maintaining a simplified food service, but Defendants did not provide sufficient evidence to support their position. *See Johnson,* 23 F.4th at 1217 (prison officials must set forth detailed evidence tailored to the situation before the court).

In light of the disputed factual issues, and Defendants' failure to sufficiently address the legitimate penological/compelling government interests at issue, both Plaintiff's and Defendants' motions for summary judgment should be denied as to Count II.

**D. Cegavske, Ford, Sisolak, and Dzurenda**

When an official is sued under 42 U.S.C. § 1983, the inmate "must show that each defendant personally played a role in violating the Constitution." *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019), *cert. denied sub nom., Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019).

In Count I, Plaintiff alleges that Dzurenda, with the approval of Sisolak, Ford and Cegavske, knew or should have known that AR 810 allowed Baker and Carpenter to substantially burden Plaintiff's religious beliefs by not keeping the holy days on the days they occur and refusing to supply Messianics with matzah and grape juice. (ECF No. 6 at 15.)

In Count II, Plaintiff alleges that these defendants knew or should have known that the promulgation of AR 814 and their failure to act when made aware by grievances that kosher meats and organically grown fruits and vegetables burdened Plaintiff's sincerely held religious beliefs. (ECF No. 6 at 24-25.)

Defendant Sisolak is Nevada's Governor. Defendant Ford is Nevada's Attorney General. Defendant Cegavske is Nevada's Secretary of State. They are members of the Board of Prison Commissioners. With respect to Count I, AR 810 and the Religious Practice Manual provided a mechanism for an inmate to request that the holy days be observed on their actual dates and to purchase consumables for holy days. This belies Plaintiff's allegation that these Defendants should have known that Baker and Carpenter could substantially burden Plaintiff's religious rights. There is no evidence that these defendants were aware of Carpenter's memo, which may have contradicted this request process, or that they knew whether Plaintiff could purchase grape juice and matzah from the canteen or obtain it from an outside source.

As to Count II, there is no evidence that these defendants were aware of Plaintiff's grievances about his kosher meals or that AR 814 did not meet Plaintiff's alleged scripturally required diet.

In sum, there is no evidence that Sisolak, Ford or Cegavske personally participated in the alleged denial of Plaintiff's religious rights; therefore, it is appropriate to grant Defendants' motion for summary judgment as to Sisolak, Ford and Cegavske.

Defendant Dzurenda is the former director of NDOC. There is no evidence that Director Dzurenda had any *personal* involvement in the alleged violation of Plaintiff's religious rights. Plaintiff presents no evidence that he submitted a grievance to Dzurenda or otherwise made him aware of the allegations proceeding in this action. Therefore, summary judgment should be granted in Dzurenda's favor insofar as he is sued in his *individual capacity*.

In *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014), the Ninth Circuit held that the current NDOC director is a proper defendant in a claim for injunctive relief because the director "would be responsible for ensuring that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to [the plaintiff's] claims." *Colwell*, 763 F.3d at 1070 (alteration original, citation and quotation marks omitted).

Defendants' motion for summary judgment as to Dzurenda should be denied insofar as he is sued in his *official capacity* because the director is an appropriate defendant to carry out injunctive relief; however, NDOC's current director Charles Daniels should be substituted in place of former NDOC Director Dzurenda in his *official capacity* under Federal Rule of Civil Procedure 25(d) (when a public officer ceases to hold office, the officer's successor is automatically substituted as a party).

23

**E. Qualified Immunity**

Defendants argue they are entitled to qualified immunity because the allegations "could only be construed as a constitutionally deficient decision that reasonably misapprehended the law" because the Common Fare diet was implemented under rabbinical supervision to adhere to Kashrut, kosher dietary laws.

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

"Early determination [of qualified immunity] is often possible 'because qualified immunity most often turns on legal determinations, not disputed facts.'" *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994)). "A bifurcation of duties is unavoidable: only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Id*. at 823 (citation omitted). "When there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity. The issue can be raised in a [Federal Rule of Civil Procedure] Rule 50(a) motion at the close of evidence." *Id*. at 824 (citing the Ninth Circuit's Model Civil Jury Instruction 9.34 (2017)).

Here, there are multiple disputed factual issues that make a determination of qualified immunity inappropriate at this juncture. Therefore, Defendants are not entitled to summary judgment on the basis of qualified immunity at this time.

**F. Exhaustion**

Plaintiff includes an argument that he need not exhaust administrative remedies with respect to a claim that challenges a regulation. Plaintiff is mistaken. The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Plaintiff's mistaken belief is of no consequence because Defendants do not raise the affirmative defense of failure to exhaust administrative remedies.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

**DENYING** Plaintiff's and Defendants' motions for summary judgment (ECF Nos. 69, 72), **except** Defendants' motion for summary judgment should be **GRANTED** as to defendants Sisolak, Ford, and Cegavske, and as to Dzurenda (only insofar as he is sued in his *individual* capacity), and NDOC's current director Charles Daniels should be **SUBSTITUTED** in place of defendant Dzurenda in his *official* capacity under Rule 25(d).

The Attorney General's Office should be directed to file a notice indicating whether it will accept service for Director Daniels within 14 days of any order disposing of this Report and Recommendation.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: February 24, 2022

_____
Craig S. Denney
United States Magistrate Judge